IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,     )
     )
     Plaintiff,     )
     )
v.     )     No. 3:22-CR-78-TAV-JEM
     )
JASON FLENNIKEN,     )
     )
     Defendant.     )

**REPORT AND RECOMMENDATION**

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. *See* 28 U.S.C. § 636(b). This case is before the undersigned on Defendant Jason Flenniken's motion to suppress evidence and his statements obtained during and after the warrantless search of his vacation rental home [Doc. 154].

Defendant Flenniken is charged, along with six named codefendants, with conspiring to distribute fifty grams or more of methamphetamine from November 5, 2021, to August 8, 2022 (Count One) [Doc. 20 p. 1]. He is also charged with possession of a firearm in furtherance of drug trafficking on August 8, 2022 (Count Two) [*Id.*].

On December 13, 2021, following a report of drugs and money at a vacation rental home ("the residence"), law enforcement conducted a "knock and talk" at the residence, where Defendant, his girlfriend, and her son were staying. When Defendant answered the door, Task Force Officer Donald Mashburn ("TFO Mashburn") asked to perform a protective sweep of the residence. Defendant responded that his girlfriend and her son were inside and agreed that officers could enter. While officers swept the residence, Defendant remained outside with TFO Mashburn. Defendant told TFO Mashburn that he wanted to "come clean" about his drug

trafficking activities and signed a rights waiver form and a consent-to-search form permitting a search of the residence. Defendant also stated that he had a backpack containing currency in the bedroom. Officers searched the residence and seized a backpack containing $19,680. The following day, Defendant went to the police station, made a statement, and left.

Defendant contends that the officers' entry and search of his residence violated the Fourth Amendment. He argues the knock and talk was not a consensual encounter and that he did not voluntarily consent to the protective sweep or the warrantless search. Defendant also asserts that his statements at the residence and at the police station were obtained in violation of his rights under the Fifth Amendment because he was not provided the *Miranda* warnings and did not voluntarily waive his rights.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds no basis to suppress the evidence in this case because the officers' actions did not contravene the Constitution. Law enforcement consensually entered the property to conduct a knock and talk, and Defendant gave valid consent for both the sweep and search of the residence. Moreover, Defendant was not in custody when questioned at either the residence or the DEA office, so the *Miranda* warnings were not required. Nevertheless, Defendant was advised of the *Miranda* warnings on both occasions and voluntarily agreed to give a statement to police. The undersigned therefore recommends that the District Judge deny Defendant's motion to suppress.

## I.     PROCEDURAL HISTORY AND SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on September 21, 2023, for an evidentiary hearing on Defendant's motion to suppress. Assistant United States Attorneys Suzanne Sullivan and Cynthia F. Davidson appeared on behalf of the Government. Attorney Forrest L. Wallace represented Defendant Flenniken, who was also present.

2

The Government presented the testimony of Pigeon Forge Police Department ("PFPD") Investigator and Task Force Officer Donald Mashburn, who testified that he has worked for the PFPD for over twenty years [Doc. 180 p. 11]. TFO Mashburn has been a drug investigator with the PFPD since 2015 and serves as a Drug Enforcement Administration ("DEA") task force officer [*Id*. at 11–12]. TFO Mashburn stated that he has had thousands of hours of training on drug cases and is familiar with identifying drugs, how drugs are packaged, and the operations of drug trafficking organizations [*Id*. at 12].

TFO Mashburn testified that on November 5, 2021, a confidential source made a controlled purchase of two ounces of crystal methamphetamine and seven grams of cocaine from Defendant at his residence in Knoxville, Tennessee [*Id*. at 13–14]. The source paid $1,300 for the drugs, and Defendant gave the source a small amount of heroin [*Id*. at 14]. TFO Mashburn characterized the amount of cocaine sold by Defendant as a "common amount" but said the amount of methamphetamine was a "large amount" consistent with drug distribution [*Id*. at 15–17]. TFO Mashburn said he considered Defendant to be a "higher level drug distributor" based upon him providing the confidential source with three different drugs [*Id*. at 17].

TFO Mashburn stated that on December 12, 2021, the confidential source told him that Defendant was staying at a cabin in Pigeon Forge [*Id*. at 17–18]. According to TFO Mashburn, the source reported that Defendant was looking for transportation to Atlanta and wanted the confidential source to rent a vehicle or drive to Atlanta to make a purchase [*Id*. at 18]. TFO Mashburn stated that drug traffickers commonly use rental vehicles to transport drugs [*Id*.]. He located the cabin where Defendant was staying on Summit Trails Drive [*Id*. at 19–20]. TFO Mashburn related that he drove by the cabin late on the night of December 12 and saw a Defendant's maroon Lexus sedan parked in front of the cabin [*Id*. at 19].

3

TFO Mashburn testified that law enforcement conducted surveillance on the cabin on the following day, December 13, 2023 [*Id*. at 20]. He saw the maroon Lexus parked in front of the cabin and a white sedan with a temporary Kentucky license tag parked behind the Lexus [*Id*. at 21]. TFO Mashburn said law enforcement followed the white sedan when it left the residence sometime after noon [*Id*. at 22–23, 25]. A Sevier County Sheriff's Department deputy conducted a traffic stop on the while sedan a short distance from the residence [*Id*. at 22]. The driver of the sedan, Bethel Stewart, was arrested for possession of marijuana [*Id*. at 22–23]. TFO Mashburn stated that Stewart was provided the *Miranda* warnings and agreed to talk to him [*Id*. at 23]. TFO Mashburn testified that Stewart said he met with Defendant Flenniken at the cabin [*Id*.].

TFO Mashburn stated that based upon his conversation with Stewart, he decided to conduct a "knock and talk" at the cabin [*Id*. at 24]. He described a knock and talk as an attempt to communicate with the occupants of a residence to further an investigation [*Id*.]. He said the knock and talk occurred a short time after the traffic stop of Stewart [*Id*. at 25]. TFO Mashburn said he and DEA TFO Nathan Stinnett walked to the door of the residence [*Id*. at 25–26]. Eight or nine officers were in the general vicinity of the residence [*Id*. at 26]. He stated that all the officers present that day were driving unmarked vehicles, and no police vehicles had lights activated during the knock and talk [*Id*.]. According to TFO Mashburn, he and TFO Stinnett were in plain clothes [*Id*.]. He was wearing his badge, either on his belt or around his neck, and had firearms strapped to his ankle and his hip [*Id*. at 26–27].

TFO Mashburn testified that he knocked on the front door, which had a window in the top half [*Id*. at 28]. He said a male voice asked who was there, and TFO Mashburn identified himself as a police officer and said he needed to talk with the individual [*Id*.]. He said a dog was barking, and the occupant said he was putting up the dog [*Id*.]. The individual returned to the

4

door within ten to fifteen seconds and opened it about halfway [*Id*. at 29–30]. TFO Mashburn said he immediately recognized the occupant as Defendant Flenniken [*Id*. at 30]. He said Defendant appeared to have a "normal" demeanor and was not angry, intoxicated, or impaired [*Id*.]. TFO Mashburn again identified himself, said he needed to talk to Defendant, and asked if Defendant would talk with him [*Id*.].

TFO Mashburn stated that Defendant agreed to talk with him [*Id*.]. He asked Defendant if anyone else was in the residence, and Defendant responded that his girlfriend and her adult son were in the house [*Id*. at 31–32]. Then, TFO Mashburn asked if the officers could check for others inside [*Id*. at 31]. He explained that he wanted to check the residence for safety reasons, to confirm that no one was being "held against their will" or "trapped" inside and that "no dead bodies [we]re in there" [*Id*.]. TFO Mashburn stated that Defendant consented to officers checking the residence [*Id*. at 31–32]. He said he waited outside with Defendant while TFO Stinnett and a couple of other officers conducted the check [*Id*. at 32]. According to TFO Mashburn, he did not frisk or handcuff Defendant's girlfriend or her son, nor did the officers remove them from the residence [*Id*.]. He said he and Defendant sat on the front steps of the residence and that Defendant was not handcuffed [*Id*. at 33]. TFO Mashburn did not consider Defendant to be in custody at this time [*Id*. at 34]. He said that if Defendant had not wanted to talk with him, Defendant could have left or gone back inside the residence [*Id*.].

TFO Mashburn said TFO Stinnett returned after a short time and reported that only a female and an older child were inside the residence [*Id*. at 34–35]. TFO Mashburn stated that while still seated on the steps, he provided the *Miranda* warnings to Defendant and told Defendant that he did not have to talk [*Id*. at 35–36]. He said Defendant responded that he wanted "to cooperate" and to "come clean about some things" [*Id*. at 36]. TFO Mashburn said he

5

did not initially tell Defendant that he would assist him in exchange for his cooperation, but he did offer to help Defendant later in their conversation [*Id*. at 37]. He denied telling Defendant that he would not be arrested or that any charges would be dismissed [*Id*.].

TFO Mashburn stated that he asked Defendant for consent to search the residence, and Defendant gave oral consent [*Id*.]. He said he followed up with a written *Miranda* waiver and consent-to-search form [*Id*. at 38]. Testifying about the *Miranda* wavier form [Exh. 3A], TFO Mashburn said although he did not read the form to Defendant, Defendant initialed each of the rights he was waiving [*Id*. at 39–40]. He said Defendant signed the rights waiver about five minutes after TFO Mashburn first knocked on the door and that he (TFO Mashburn) and TFO Stinnett signed as witnesses [*Id*. at 40]. TFO Mashburn also identified the consent-to-search form [Exh. 3B], in which Defendant agreed the officers could search the residence and his Lexus [*Id*. at 42–43]. He watched Defendant sign the consent form, and he and TFO Stinnett signed as witnesses [*Id*. at 43–44]. TFO Mashburn stated Defendant did not limit or halt the search while it was proceeding [*Id*. at 44–45]. He said he remained on the front steps with Defendant while TFO Stinnett and other officers searched the residence [*Id*. at 45]. TFO Mashburn said Defendant's girlfriend and her son remained inside the residence during the search [*Id*.].

TFO Mashburn said during the search, he questioned Defendant as part of his investigation [*Id*.]. He stated that he asked Defendant whether any drugs were in the residence, and Defendant said no drugs were present [*Id*. at 46]. TFO Mashburn said the officers found no drugs during their search of the residence [*Id*.]. He said Defendant told him that a large amount of money was in the bedroom [*Id*.]. TFO Mashburn said he also asked Defendant if any guns were in the residence [*Id*.]. TFO Mashburn said he told TFO Stinnett what Defendant said about

currency in the residence and TFO Stinnett went inside to look for it [*Id.*]. He said law enforcement located a large amount of currency in the bedroom [*Id.* at 46–47].

TFO Mashburn stated that Defendant was not arrested that day [*Id.* at 47]. He said, instead, after the money was located, Defendant wanted to cooperate [*Id.*]. TFO Mashburn stated that Defendant said he had a terminal illness with only six months to live and wanted "to come clean," meaning he wanted to talk about his drug distribution activities [*Id.*]. TFO Mashburn determined that he would rather meet with Defendant at the DEA office because there the interview could be transcribed, an analyst could be present, and he believed Defendant would be more relaxed away from the residence [*Id.* at 47–48]. He said he and Defendant made an appointment to meet at the DEA office early the next morning [*Id.* at 48]. He gave Defendant his work telephone number, and Defendant texted him his contact number [*Id.*]. TFO Mashburn said following the search, he spoke with Defendant's girlfriend and her son, reassuring them that no one would be arrested that day [*Id.* at 48–49]. TFO Mashburn stated that he prepared a report on the search of the residence on the following day [*Id.* at 56; Exh. 3C].

TFO Mashburn testified that he met with Defendant at the DEA office the following day, December 14, 2021 [*Id.* at 49]. Defendant called or texted him when he arrived, and TFO Mashburn met Defendant outside the building and brought him in a side entrance [*Id.* at 50]. He said DEA Analyst Kari Sams took notes during the interview [*Id.*]. TFO Mashburn said following the interview, he continued to communicate with Defendant by text messages and telephone calls on his PFPD cellular telephone [*Id.* at 51]. He said when he later provided his text messages with Defendant to the Government for disclosure in discovery, Defendant's part of the conversations was no longer present [*Id.* at 51–52]. TFO Mashburn said he asked the Pigeon Forge Information Technology Department ("IT Department") if the text messages were

7

archived or saved, but they were not [*Id*. at 52]. TFO Mashburn explained that he turned in his original cellphone after the screen broke [*Id*. at 53]. He said the IT Department attempted to extract the Defendant's texts from his original cellphone without success [*Id*. at 52]. TFO Mashburn said the DEA IT Department could not perform an extraction on his original cellphone [*Id*. at 53]. TFO Mashburn said he conferred with the Tennessee Bureau of Investigation ("TBI") in Knoxville, and Special TBI Agent Dawn Mackey advised that parts of conversations can be lost during the process of transferring data between cellphones [*Id*. at 53–54]. He said the texts from Defendant occurring after he changed cellphones are present [*Id*. at 55]. TFO Mashburn stated that he did not delete any text messages from Defendant [*Id*.].

On cross-examination, TFO Mashburn testified the following officers from the DEA Task Force were present at the residence: his supervisor James Blanton, TFO Nathan Stinnett, TFO Jerry Orr, TFO Jacob Wilson, TFO Trooper Bradley Robbins, Special Agent Mike Davis, and two others besides himself [*Id*. at 57–59]. TFO Mashburn said no K-9 officers were present for the search of the residence [Id. at 97]. He said PFPD Detective John Thornton was present during the surveillance of the residence but not during the knock and talk [*Id*. at 59]. He stated that Sevier County Sheriff's Deputy Samuel Swaney conducted the traffic stop of Bethel Stewart's vehicle [*Id*. at 60].

TFO Mashburn stated that Stewart, who was driving a white Chevrolet Malibu, was stopped for speeding in a school zone [*Id*.]. TFO Mashburn was notified of the stop and reported to the scene [*Id*. at 61]. He agreed that Stewart was advised of the *Miranda* warnings because it was a custodial interrogation [*Id*.]. He said he questioned Stewart at the scene of the traffic stop, and Stewart told him that a large amount of methamphetamine was at the residence [*Id*. at 61, 72]. According to TFO Mashburn, Stewart's vehicle was searched, and officers seized marijuana

either from the vehicle or from Stewart's person [*Id.* at 62–63]. TFO Mashburn later learned that methamphetamine was seized from Stewart's person during a body cavity search upon Stewart's intake at the jail [*Id.* at 63].

TFO Mashburn stated that he believed evidence of drugs would be at the residence based upon the information from both the confidential source and Stewart [*Id.* at 64]. He agreed that the same confidential source who conducted the controlled buy gave him the information about Defendant being at the residence [*Id.*]. TFO Mashburn said that he believed the confidential source was credible at the time, but he would no longer use that confidential source who has since been incarcerated [*Id.* at 64–65].

TFO Mashburn stated that on December 12, 2021, he and TFO Jacob Wilson were conducting surveillance in separate vehicles [*Id.* at 68]. TFO Mashburn used the Flock System, which reads license plates, to locate Defendant's Lexus [*Id.* at 69]. He acknowledged he did not have search warrant for the residence or outstanding arrest warrants for anyone at the residence [*Id.* at 70]. TFO Mashburn said he was investigating Defendant as a large-scale drug distributor [*Id.* at 71]. After talking with Stewart, he believed that drugs, money, weapons, and drug paraphernalia would be found at the residence and decided to conduct a knock and talk [*Id.*]. TFO Mashburn and TFO Stinnett went to the door of the residence [*Id.* at 72]. He said the other officers were behind him but within sight [*Id.* at 72, 75]. TFO Mashburn said seven to nine vehicles belonging to the officers present were parked on the street or close to the residence [*Id.* at 74–75].

TFO Mashburn testified that he knocked on the front door four to six times [*Id.* at 75–76, 78]. After he knocked on the door, he heard Defendant say he was putting up his dog [*Id.* at 75]. TFO Mashburn said his firearm was visible in a holster on his hip and his badge was also visible

[*Id*. at 79]. He said Defendant came outside onto the porch, and during their conversation, he and Defendant sat on the front steps [*Id*. at 79–80].

TFO Mashburn said TFO Stinnett entered the residence about one minute after Defendant came outside and after Defendant gave TFO Mashburn consent to "check the house" [*Id*. at 80–81]. He agreed that he had no reason to believe that a kidnapping victim or a dead body was inside the house and that no exigent circumstances were present [*Id*. at 81–82]. TFO Stinnett returned to the porch and reported that a female and a "young boy" were inside the residence [*Id*. at 85]. TFO Mashburn said he learned about the backpack from Defendant and that either he told TFO Stinnett or TFO Stinnett heard Defendant's comment about the backpack [*Id*.].

TFO Mashburn estimated that he remained outside with Defendant for twenty to thirty minutes before he (TFO Mashburn) entered the residence [*Id*. at 82]. He said he did not record or document his conversation with Defendant from December 13 [*Id*. at 83]. After realizing Defendant wanted to cooperate, he said he decided to document an interview the following day [*Id*. at 84–85]. TFO Mashburn said when he went inside the residence, TFO Stinnett had removed the currency from the backpack [*Id*. at 86]. He said TFO Trooper Robbins photographed the evidence from the search of the residence [*Id*. at 87].

TFO Mashburn stated that he spoke with Defendant's girlfriend, Tabitha Johnson, while at the residence [*Id*. at 89]. He said he exchanged contact information with Ms. Johnson to remain in contact with Defendant [*Id*.]. He agreed that based upon the prior controlled buy, the evidence seized from the residence, and Defendant's statements, he could have arrested Defendant following the search of the residence [*Id*. at 89–91]. TFO Mashburn said that while they were on the porch, Defendant said he was a drug dealer and that drug proceeds were inside the residence [*Id*. at 90]. Instead of arresting Defendant, TFO Mashburn gave Defendant the

Case 3:22-cr-00078-TAV-JEM    Document 185    Filed 12/07/23    Page 10 of 33
PageID #: 910

opportunity to cooperate the next day to further their investigation [*Id*. at 91]. He said he did not mention the controlled buy from November 5 to Defendant because it may have compromised the investigation and the confidential source's safety [*Id*. at 92].

Regarding the December 14 interview of Defendant at the DEA office, TFO Mashburn said the meeting was not recorded [*Id*.]. He interviewed Defendant in a standard interview room and he, Defendant, Analyst Sams, and TFO Jerry Orr sat around a table [*Id*. at 92–94]. The interview lasted about two hours [*Id*. at 93]. TFO Mashburn said that the information provided by Defendant seemed "somewhat" credible and that he wanted to continue working with Defendant after the interview [*Id*. at 94]. TFO Mashburn thought he provided the *Miranda* warnings to Defendant at the beginning of the interview because that is his standard practice [*Id*. at 95]. He said Defendant was very forthcoming with information during the interview and did not appear to be intoxicated [*Id*.].

TFO Mashburn testified that three agencies attempted to extract information from his cellphone but failed: PFPD; the DEA in Louisville, Kentucky; and the TBI [*Id*. at 95–96]. He identified Verizon as the cellular service provider for his work cellphone [*Id*. at 97].

The Government called TFO Nathan Stinnett, who testified that he works for the Oak Ridge Police Department and is assigned to the DEA Task Force as a narcotics investigator [*Id*. at 98–99]. He has received training in narcotics investigation and has worked in law enforcement for eleven years and as a DEA task force officer for six years [*Id*. at 100].

TFO Stinnett testified that on December 13, 2021, he participated in a knock and talk at a cabin where Defendant was staying [*Id*. at 100–01]. He said he went to the residence with the case agent TFO Mashburn and other task force officers and agents [*Id*. at 101–02]. He estimated between seven and nine officers were on the scene [*Id*. at 102]. TFO Stinnett said he and TFO

11

Mashburn walked up to the door of the residence, but the other officers remained behind them [*Id*.]. He could not see or touch the other officers [*Id*. at 102–03]. TFO Stinnett said he was dressed in plain clothes and his firearm was under his shirt and not visible [*Id*. at 103]. He was wearing his badge around his neck [*Id*.]. Neither he, nor TFO Mashburn were wearing clothing that identified them as DEA officers [*Id*. at 104].

TFO Stinnett said he could see movement and shapes through the glass on the front door of the residence [*Id*. at 104–05]. TFO Mashburn knocked on the door, and a male, later determined to be Defendant, stated he was putting up his dog [*Id*. at 105]. TFO Stinnett stated that Defendant answered the door forty-five seconds to one minute later [*Id*.]. TFO Stinnett said Defendant appeared relaxed and did not appear nervous or under the influence of intoxicants [*Id*. at 106–07]. TFO Mashburn asked to talk to Defendant, and he said Defendant stepped out onto the front porch and steps [*Id*. at 107]. TFO Stinnett said TFO Mashburn asked Defendant for permission for officers to enter the residence and conduct a "safety sweep" [*Id*. at 108]. TFO Stinnett said he performed the sweep because Defendant gave consent, and he would not have entered the residence without consent because he had no basis to do so [*Id*. at 108–09]. He said Defendant told them that his girlfriend was inside and that her son with special needs was upstairs [*Id*. at 109]. TFO Stinnett said when he entered the residence to conduct the sweep, he first went upstairs to check on Defendant's girlfriend's son [*Id*.]. He located the young man who was in his early teens and playing videogames, talked to him briefly, and brought him downstairs to his mother [*Id*. at 110]. He said neither Defendant's girlfriend, nor her son, were handcuffed [*Id*.]. TFO Stinnett said during the sweep, he did not search the house for drugs, guns, or money [*Id*. at 111]. He said the sweep took two to three minutes, and then he returned to the porch with Defendant and TFO Mashburn [*Id*.].

12

TFO Stinnett said when he returned to the porch, Defendant's demeanor seemed the same as earlier [*Id*. at 112]. He was present when TFO Mashburn asked Defendant if he wanted to talk with him and when TFO Mashburn presented the advice-of-rights form to Defendant [*Id*. at 112–13; Exh. 3A]. TFO Stinnett observed Defendant initial the rights listed on the form and signed it [*Id*. at 113]. He said he and TFO Mashburn signed the form as witnesses.

TFO Stinnett stated that Defendant also signed a consent form permitting the search of the residence and his Lexus [*Id*. at 114–15]. He and TFO Mashburn also signed the consent-to-search form as witnesses [*Id*. at 115]. TFO Stinnett said he would not have signed the consent-to-search form, if he thought Defendant was under duress [*Id*. at 116]. He agreed that he believed Defendant willingly consented to the search of the residence [*Id*.]. He said after receiving consent from Defendant, he and other officers searched the residence [*Id*.]. TFO Stinnett identified a photograph of Defendant's girlfriend sitting on the back porch of the residence during the search [*Id*. at 118; Exh. 4]. He said Defendant's girlfriend never asked them to stop searching or became angry with the officers [*Id*. at 118].

TFO Stinnett said while TFO Mashburn was talking with Defendant on the front porch, he overheard Defendant say that there was currency in the bedroom [*Id*. at 119]. TFO Stinnett searched the bedroom on the ground floor and located a backpack containing stacks of currency secured with rubber bands [*Id*. at 119-20; Exhs. 5A & 5B]. TFO Stinnett seized the money [*Id*. at 121]. He said Defendant was not handcuffed during the search, nor was he in custody [*Id*. at 121].

On cross-examination, TFO Stinnett agreed that he overheard Defendant tell TFO Mashburn the location of the backpack [*Id*. at 122–23]. He did not go into the downstairs bedroom during the safety sweep but one of the other officers did [*Id*. at 123]. TFO Stinnett said

Case 3:22-cr-00078-TAV-JEM   Document 185   Filed 12/07/23   Page 13 of 33
PageID #: 913

he saw the backpack on the floor and unzipped it [*Id*.]. He said the backpack was not locked [*Id*. at 124]. TFO Stinnett said TFO Bradley Robbins of the Tennessee Highway Patrol took photographs during the search [*Id*.]. He said TFO Robbins photographed the backpack before they moved it [*Id*. at 125]. TFO Stinnett identified a photograph of the backpack with a lock with keys hanging from it [*Id*. at 127; Exh. 5A]. He did not recall having to unlock the backpack to remove the lock and unzip it [*Id*. at 127].

TFO Stinnett said he did not participate in surveilling the residence on December 12 or in the traffic stop [*Id*. at 128]. He was on a surveillance team about one hundred yards from where the traffic stop occurred waiting to follow vehicles to leaving the residence [*Id*. at 129].

TFO Stinnett testified the other officers were twenty-five to thirty feet away from him and TFO Mashburn when they knocked at the residence [*Id*. at 130]. He said some of the officers could have been visible from the front porch of the residence [*Id*. at 130–31]. He said the safety sweep of the residence was brief and that Defendant's girlfriend did not seem to be in distress during the safety sweep [*Id*. at 131]. He said he did not ask her to remain in a specific part of the house [*Id*. at 131–32]. TFO Stinnett testified that later, during the search of the residence, he searched the master bedroom, which contained the backpack [*Id*. at 132, 136]. He said the residence had one bedroom downstairs and two or three bedrooms upstairs [*Id*. at 136]. TFO Stinnett said law enforcement did not find any controlled substances or ledgers in the residence [*Id*.]. He said Defendant's girlfriend did not make a statement to him during or after the search [*Id*. at 137].

TFO Stinnett said he was not present when TFO Mashburn and Defendant discussed meeting the next day [*Id*. at 133]. He saw Defendant meeting with TFO Mashburn at the DEA

office the day after the knock and talk, but he did not attend the interview [*Id*. at 134]. He stated that the DEA had the ability to record interviews [*Id*. at 134–35].

The Government also called Kari Sams who testified that she has worked as a DEA Intelligence Research Specialist for four years [*Id*. at 138]. Prior to her work at the DEA, she worked a contract analyst for law enforcement for twelve years [*Id*. at 138–39]. Ms. Sams said she provides case support to the task force officers, including identifying targets, performing toll analysis, providing search warrant support, performing cellphone forensics, and assisting with Title III investigations, interviews, and debriefs [*Id*. at 139]. She stated that she was working in the DEA office on December 14, 2021, when Defendant came to meet with DEA Mashburn [*Id*. at 140]. Ms. Sams said Defendant had arranged to meet with TFO Mashburn, and he arrived at the DEA office alone [*Id*. at 140–41].

Ms. Sams stated that she, TFO Mashburn, and TFO Jerry Orr met with Defendant in an interview room beginning at 3:50 p.m. [*Id*. at 141]. The interview room contained a table and chairs, was well lit, and the door was open during the interview [*Id*. at 142]. Ms. Sams said Defendant was not handcuffed [*Id*.]. She stated that Defendant was told he could leave at any time and that he could have a lawyer present [*Id*. at 143]. Ms. Sams said if Defendant had asked for a lawyer, they would have stopped the interview [*Id*.]. She did not know whether Defendant was advised of the *Miranda* warnings [*Id*. at 148]. Ms. Sams said Defendant was given water and was not threatened during the interview [*Id*. at 144].

Ms. Sams stated that she took notes during the interview and then prepared a report from her notes [*Id*. at 143; Exh. 6]. She and TFO Mashburn questioned Defendant during the interview, and he provided information helpful to their investigation [*Id*. at 144]. She related that consistent with his statements to task force officers the day before, Defendant stated that he

began distributing marijuana in 2009 or 2010 for income after he was injured and could no longer work [*Id.* at 145]. She said Defendant related that he began distributing methamphetamine in March of 2021 [*Id.*]. Ms. Sams said Defendant told them his source of supply for methamphetamine was in Atlanta, Georgia, and he showed them the contact information for his source on his cellphone [*Id.*]. She said Defendant told them he wanted to cooperate but that he was afraid of the cartel [*Id.* at 146]. Ms. Sams said Defendant became emotional and cried while discussing his fear of the cartel and his concerns for his family [*Id.*]. She said Defendant was told to communicate with TFO Mashburn if he wanted to provide additional cooperation on his source of supply [*Id.* at 147].

Ms. Sams estimated that the interview lasted two and one-half to three hours [*Id.*]. She said Defendant asked questions about his safety if he cooperated [*Id.*]. She said they assured Defendant that they would do what they could to protect him [*Id.*]. Ms. Sams stated that Defendant was free to leave during the interview and was not arrested at its conclusion [*Id.* at 147–48].

On cross-examination, Ms. Sams agreed that they could have recorded Defendant's interview [*Id.* at 149]. She said the interview was not recorded because Defendant came in voluntarily, and they do not typically record voluntary interviews [*Id.*]. Ms. Sams stated that it was the case agent TFO Mashburn's decision on whether to record the interview [*Id.* at 150]. She said before Defendant arrived, TFO Mashburn told her that Defendant was coming to talk to them [*Id.*]. She did not know what time Defendant was supposed to arrive [*Id.* at 151].

Ms. Sams agreed that the *Miranda* rights and the right to an attorney were discussed with Defendant [*Id.*]. She did not know why she did not include this information in her notes or her report [*Id.*]. She agreed that if Defendant was advised of the *Miranda* rights and his right to

16

counsel, this should have been documented [*Id.* at 152]. Ms. Sams stated that she was aware of the operation involving TFO Mashburn and the other officers the day before Defendant's interview [*Id.* 153]. She was also aware that cash was seized in that operation [*Id.*].

The parties filed post-hearing briefs in lieu of oral argument. Defendant filed a post-hearing brief on October 19, 2023 [Doc. 183]. The Government filed a post-hearing brief on November 2, 2023 [Doc. 184]. Thereafter, the Court took the matter under advisement.

## II.    FINDINGS OF FACT

Based upon the testimony and exhibits from the September 21 evidentiary hearing,[1] the undersigned makes the following factual findings.

In late 2021, TFO Mashburn was investigating the drug trafficking activities of Defendant Jason Flenniken. On November 5, 2021, a confidential source made a controlled buy of two ounces of cocaine and seven grams of methamphetamine from Defendant at his home in Knoxville, Tennessee. Defendant also gave the confidential source a small amount of heroin during the transaction. On December 12, 2021, the same confidential source told TFO Mashburn that Defendant was staying in a cabin in Pigeon Forge. With the aid of license plate readers, TFO Mashburn located Defendant's maroon Lexus sedan parked in front of a rental home on Summit Trails Drive.

The following day, December 13, 2021, TFO Mashburn and other officers conducted a surveillance operation at the residence. Surveilling officers observed a white sedan with a Kentucky temporary tag parked at the residence along with Defendant's Lexus. Shortly after

---

[1]     Defendant subpoenaed Tabitha Johnson for the September 21, 2023 hearing, but she did not appear. Defense counsel noted that Ms. Johnson had pending charges in Knox County General Sessions Court [Doc. 180 p. 155]. He asked to continue the hearing to call Ms. Johnson as a witness [*Id.*]. The Court continued the hearing to September 26, 2023, but Ms. Johnson again failed to appear [*See* Doc. 175, Minutes].

17

noon, officers covertly followed the white sedan when it left the residence. A Sevier County Sheriff's deputy stopped the white sedan for speeding in a school zone a few miles from the residence. The deputy arrested the driver, Bethel Stewart, for possession of marijuana. After being advised of the *Miranda* warnings, Stewart agreed to talk to TFO Mashburn. Stewart said he met with Defendant at the residence and that he saw a large amount of methamphetamine and currency there. Methamphetamine was later seized from Stewart's person during intake at the jail.

TFO Mashburn and other officers involved in the operation returned to the residence to continue the investigation. Nine officers, all in unmarked vehicles, parked near the residence. TFO Mashburn and TFO Stinnett, who were clad in plain clothes with their badges visible, walked to the front door to conduct a knock and talk. TFO Mashburn's gun was holstered on his hip and visible. The other officers remained twenty-five to thirty feet away and within sight of the officers at the door.

TFO Mashburn knocked on the door, and a male occupant asked who was there. TFO Mashburn identified himself as a police officer and stated that he wanted to talk to the occupant. The man responded that he had to secure his dog. Within one minute, Defendant opened the door. TFO Mashburn again identified himself and asked to talk with Defendant. Defendant stepped outside onto the porch. TFO Mashburn asked if anyone was inside the residence. Defendant replied that his girlfriend and her son were inside. TFO Mashburn asked if the officers could check the residence, and Defendant agreed. TFO Mashburn and a couple of officers conducted a sweep of the residence. Only Defendant's girlfriend Tabitha Johnson and her teenage son were present, and they were permitted to remain inside. TFO Stinnett returned to the

porch, where Defendant and TFO Mashburn sat on the steps, and reported on the occupants present.

Defendant told TFO Mashburn that he wanted to cooperate and tell about his involvement with drug trafficking. TFO Mashburn advised Defendant of the *Miranda* rights, and Defendant said he understood his rights. TFO Mashburn requested consent to search the residence, and Defendant gave consent. At TFO Mashburn's request, Defendant signed a rights waiver form and a consent-to-search form. TFO Mashburn and TFO Stinnett also signed both forms as witnesses. While still on the porch with Defendant and TFO Mashburn, TFO Stinnett overheard Defendant tell TFO Mashburn that he had currency in a backpack in the master bedroom of the residence. TFO Stinnett participated in the search of the residence with other officers. TFO Stinnett went to the master bedroom and located a backpack containing a large amount of currency, which was later determined to be more than $19,500.

While still on the porch, Defendant agreed to meet with TFO Mashburn the following morning. Defendant exchanged contact information with TFO Mashburn. TFO Mashburn also exchanged contact information with Defendant's girlfriend and assured her that no one would be arrested that evening.

On December 14, 2021, Defendant came to the DEA office at 3:50 p.m. Defendant called TFO Mashburn when he arrived, and TFO Mashburn met him near the parking lot and walked in with him. TFO Mashburn, TFO Orr, and Analyst Kari Sams interviewed Defendant. Defendant was told about his rights and that he could ask for a lawyer. He was told that he could leave at any time. Defendant agreed to the interview and discussed his source of supply for methamphetamine with the officers. Defendant became emotional and wept when expressing his fear of a drug cartel and his concern for his family. Before Defendant left, the officers told

19

Defendant to contact TFO Mashburn if he wanted to continue to cooperate. Defendant continued to communicate with TFO Mashburn by text message after that day.

## III.     ANALYSIS

Defendant Flenniken asks the Court to suppress the currency seized from the residence and his statements at the residence on December 13, 2021, and at the DEA office the following day [Doc. 154 p. 1; Doc. 183 p. 1]. Defendant argues that knock and talk, protective sweep, and warrantless search of the residence violated his rights under the Fourth Amendment [Doc. 154 pp. 4–8; Doc. 183 pp. 11-13]. He asserts that the knock and talk was not a consensual encounter and that his consent to enter the residence and to the search was coerced [Doc. 154 pp. 6–8; Doc. 183 pp. 11–13]. Defendant also contends that his statements both at the residence and the following day were unwarned in violation of *Miranda* and involuntary in violation of the Fifth Amendment [Doc. 154 pp. 8–11; Doc. 183 pp. 14–15].

After examining the evidence and the relevant case law, the undersigned finds that the knock and talk was consensual and that officers conducted a protective sweep and a search of Defendant's residence pursuant to his valid consent. Defendant was not in custody when questioned on the front steps of his residence on December 13, 2021, but, nevertheless, executed a valid rights waiver and voluntarily agreed to talk with the officers. Nor was Defendant in custody when interviewed at the DEA office the next day. Finally, Defendant knowingly and voluntarily made statement on December 14, 2021, at the DEA office. Accordingly, the undersigned recommends that the District Judge deny Defendant's suppression motion.

### A.     Fourth Amendment Claims

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. "[T]he Fourth Amendment has drawn a firm line at the entrance to the

house. Absent exigent circumstances [or an applicable exception], that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (holding warrantless searches are "*per se* unreasonable . . . subject to only a few specifically established and well-delineated exceptions"); *United States v. Thomas*, 430 F.3d 274, 276 (6th Cir. 2005) (quoting *Payton*). Defendant argues that the knock and talk, protective sweep, and warrantless search of his residence all violated the Fourth Amendment.

### 1. Knock and Talk

Defendant Flenniken argues that the knock and talk at the residence was not a consensual encounter and, instead, amounted to a constructive entry of his home [Doc. 154 p. 5]. He contends that he had no choice but to comply with the officers' show of authority and interact with them on his porch [*Id.*].

The Fourth Amendment's protection of the home extends to the curtilage, which is the "area 'immediately surrounding and associated with the home'" and is considered "'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred[, and s]uch conduct . . . is presumptively unreasonable absent a warrant." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citation omitted).

Law enforcement officers, however, can approach door of a residence and knock just like any private citizen. *See Caniglia v. Strom*, 141 S. Ct. 1596, 1598–99 (2021) ("[O]fficers may generally take actions that 'any private citizen might do[.]'" (citation omitted)); *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) ("Consensual encounters do not lose their propriety,

21

moreover, merely because they take place at the entrance of a citizen's home."). "The Sixth Circuit has held that a police officer knocking on the front door of a home to speak with the occupant—colloquially referred to as a 'knock and talk' procedure or technique—is generally permissible, provided it is consensual." *United States v. Mills*, 372 F. Supp. 3d 517, 530 (E.D. Mich. 2019) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 713 (6th Cir. 2016)) (footnote omitted). "[T]he officers' right to enter the property like any other visitor comes with the same limits of that 'traditional invitation': 'typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Morgan v. Fairfield County*, 903 F.3d 553, 563 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 8)).

"[A] consensual encounter at the doorstep may evolve into a 'constructive entry' when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home." *Thomas*, 430 F.3d at 277. Tactics such as officers surrounding the house, drawn weapons, raised voices, spotlights focused on the residence, and demands that the occupant come out characterize a constructive entry. *Id*. at 277–78. But none of those tactics were present here. Instead, TFOs Mashburn and Stinnett knocked on the front door of the residence, identified themselves as law enforcement at Defendant's inquiry, and waited for him to secure his dog. Their weapons were holstered and, in the case of TFO Stinnett not visible. When Defendant opened the door, TFO Mashburn again identified himself and asked to talk to Defendant. Defendant stepped out onto the porch of his own accord.[2] No spotlights or sirens

---

[2]    In his motion, Defendant states that after he opened the door, an officer grabbed his shirt collar, pulled him outside, and ordered him to remain on the porch [Doc. 154 p. 2]. TFOs Mashburn and Stinnett both testified that Defendant stepped out onto the porch after answering the door [Doc. 180 pp. 79, 107]. TFO Stinnett denied that TFO Mashburn asked Defendant to come out of the residence [*Id*. at 107].

were employed, and the lights on the officers' unmarked vehicles were not strobing. Although Defendant points out that nine officers were present, only TFO Mashburn and TFO Stinnett approached the house. The other officers remained twenty-five to thirty feet back from the door. On this record, the undersigned finds the knock and talk was consensual.

### 2. Protective Sweep

Defendant was not under arrest and, as TFO Stinnett acknowledged in his testimony, law enforcement did not have a legal basis to conduct a protective sweep of his residence. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) ("A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."). Both TFO Mashburn and TFO Stinnett testified that Defendant consented to a sweep of his residence [Doc. 180 pp. 31–32, 81, 108–09]. Defendant does not contest the fact of his consent. He argues that he did not voluntarily consent to the officer's entry into his residence. *See United States v. Holland*, 522 F. App'x 265, 273–76 (6th Cir. 2013) (examining voluntariness of defendant's consent to protective sweep and explaining that a "warrantless entry is not per se unreasonable if the defendant consents to it").

To be voluntary, consent must be "'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Id.* at 274 (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)). The test for whether consent was voluntary is an objective one assessed by examining the totality of the circumstances, including Defendant's knowledge that he could refuse entry, his "personal characteristics, the length and nature of the police-citizen interaction, and the use of police coercion, subtle or otherwise." *Id.* (citations omitted).

23

The Government bears the burden of showing voluntary consent and not "mere acquiescence" to law enforcement. *Id*. (citation omitted).

Here, the totality of the circumstances reveals that Defendant Flenniken voluntarily consented to the sweep of his residence. TFO Mashburn and TFO Stinnett testified that they knocked on Defendant's door and asked to talk to him. They were dressed in plain clothes and driving an unmarked vehicle. Although armed, neither officer drew his weapon, and TFO Stinnett's weapon was not visible. The officers were calm and cordial. TFO Mashburn described Defendant's demeanor as "normal" and stated he was not upset or impaired. The length of the encounter at that point was brief, with the request to "check" the house coming within a minute of Defendant stepping outside. Finally, as to his personal characteristics, Defendant avers that in December 2021, he was thirty-nine years old, literate, had several misdemeanor convictions in state court, and "cognitively he was capable of judging whether to provide consent" [Doc. 154 pp. 6–7]. These circumstances all support a finding that Defendant voluntarily consented to the sweep of his residence.

Defendant contends that the nine officers on the scene "established a tight perimeter at the front door," which constituted a "passive show of force . . . [that] contaminat[ed] his decision-making process" [Doc. 183 p. 13]. He maintains that the number of officers present and their proximity to him was a subtle form of coercion to which he merely acquiesced [*Id*.].

But the proof from the evidentiary hearing contradicts this argument. Although nine officers came to the residence, only TFOs Mashburn and Stinnett came to the door. All officers were in unmarked vehicles, no lights or sirens were activated, and none of the officers drew their weapons. TFO Mashburn stated that he did not know how close the other officers were to the door of the residence, but he thought they were within sight [Doc. 180 pp. 72–75]. TFO Stinnett

24

estimated the other officers were twenty-five to thirty feet away. TFO Stinnett said some of the other officers could have been visible from the front porch of the residence [*Id.* at 130–31]. This testimony belies Defendant's assertion that the other officers formed a perimeter around the porch.

Considering the totality of the circumstances, the undersigned finds Defendant voluntarily consented to a sweep of his residence.

### 3. Search of Residence

Defendant argues that he did not voluntarily consent to a search of the residence. He maintains that he had no choice but to agree to the search because officers had already searched his home during the sweep [Doc. 183 p. 13].

An individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment. *Bustamante*, 412 U.S. at 228–29; *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). The applicability of this exception is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir. 1978). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010) (citation omitted).

"Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016) (citation omitted); *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (requiring consent to be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion"). The determination of voluntariness turns upon the totality of the circumstances,

including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood he had the right to decline to consent; and (3) whether the individual understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citation omitted). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Worley*, 193 F.3d at 386.

As discussed above, Defendant's age, education, and criminal history reveal his consent to the search of the residence was voluntary. Defendant was not agitated or impaired. Defendant signed a consent-to-search form agreeing that he had not been "threatened, nor forced in any way" and that he was "freely consent[ing] to this search" [Exh. 3B]. TFO Mashburn and TFO Stinnett signed as witnesses to Defendant's consent [*Id.*]. Moreover, Defendant gave verbal consent to search approximately five minutes after TFO Mashburn knocked on his door. He was sitting on the front porch steps with TFO Mashburn and had told Mashburn that he wanted to cooperate. TFO Stinnett had concluded the protective sweep and reported that only Defendant's girlfriend and her son were inside. Ms. Johnson and her son were permitted to remain inside.

Examining the totality of the circumstances, the undersigned finds that Defendant's consent to search his residence was voluntary.

### B.     Fifth Amendment Claims

A defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth

Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted); *Salvo*, 133 F.3d at 948.

Defendant contends that the officers violated his rights under the Fifth Amendment when they questioned him at the residence and at the DEA office without providing the *Miranda* warnings. He further argues that he did not voluntarily make a statement at either location but, instead, his statements were the product of police coercion.

### 1.    Custodial Interrogation

Defendant argues that TFO Mashburn should have provided the *Miranda* warnings as soon as he stepped onto the porch [Doc. 183 p. 14]. He argues that he was in custody from that moment because he was surrounded by officers, officers were soon "swarming through his home" during the sweep, and he was kept outside with TFO Mashburn sitting beside him, which is a restraint on his movement, so that he would not interfere with the investigation [*Id*. at 13–14].

The obligation to administer the *Miranda* warnings only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Custodial interrogation is questioning after the subject is "taken into custody or the restraint on his freedom . . . rise[s] to the level associated with a formal arrest." *Salvo*, 133 F.3d at 948 (citation omitted). The custodial or noncustodial nature of an interview turns on whether a reasonable person would have felt free to end the interview and leave. *Id*. at 949–50 (citing *Thompson v. Keohane*, 516 U.S. 99, 111–13 (1995)). To determine whether an individual was in custody for purposes of *Miranda*, the court examines the

circumstances surrounding the questioning and asks "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury*, 511 U.S. at 325). "Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told [he] need not answer the questions." *Id*. (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)). Other factors are "the purpose of the questioning," whether the suspect was told he or she was free to leave, and whether the "suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." *Salvo*, 133 F.3d at 950.

An examination of these factors shows that Defendant was not in custody while questioned on his porch. *Swanson*, 341 F.3d 524, 529; *Salvo*, 133 F.3d at 950. First, the location of the interview was Defendant's vacation home. One's home is ostensibly the location he or she is most at ease and "unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as [he or she] want[s], in curbing the scope of the interview or in simply asking the officers to leave." *Panak*, 552 F.3d at 465–66. Accordingly, "when police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates *Miranda* warnings." *Id*. at 466 (quotation marks omitted).

Other factors, however, such as "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the nature of the questioning," can transform an interview at one's home into custodial interrogation. *Id*. None of those circumstances did so here. Although several officers were present, only TFOs Mashburn and Stinnett interacted with

Defendant. The evidence does not reveal that the officers made a show of authority or drew their weapons. Instead, early in the encounter, Defendant told TFO Mashburn that he wanted to cooperate and "come clean" about his drug trafficking activities. The length of the interview was short, lasting only around twenty minutes. Importantly, Defendant was advised of the *Miranda* warnings and signed a rights waiver, stating that he understood his rights and was willing to answer questions [Exh. 3A]. These circumstances reveal that Defendant was not in custody when questioned at his residence, and the *Miranda* warnings were not required but were given.

Defendant also challenges that he was not provided the *Miranda* warnings in writing before the December 14 interview at the DEA office.[3] "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495); *United States v. Protsman*, 74 F. App'x 529, 533 (6th Cir. 2003) (quoting *Mathiason*). *C.f. Hinojosa*, 606 F.3d at 883 (observing that police stations are more coercive than a person's home or another location). Although the December 14 interview occurred at the DEA office, the location and circumstances of the interview were not coercive. Defendant voluntarily came to the DEA office and the purpose of the interview was for him to provide cooperation. He met with the officers in an interview room with an open door. The interview lasted around two hours, during which Defendant was not handcuffed, nor was his movement restrained. *See United States v. Mahan*, 190 F.3d 416, 420, 422 (6th Cir. 1999)

---

[3]     In his motion, "Defendant concedes that he was not in custody on December 14, 2021" [Doc. 154 p. 10; *but see id*. at 11 (arguing the officers should have given "the standard *Miranda* warnings" to Defendant at the DEA office)]. In his post-hearing brief, however, Defendant asserts that he was interviewed for two hours "without reviewing written *Miranda* warnings" [Doc. 183 p. 14]. He asserts that although both TFO Mashburn and Analyst Sams "recalled some preliminary statements about rights, . . . no rights waiver was executed" [*Id*. at 15]. Because Defendant seems to challenge the validity of any *Miranda* waiver, the undersigned also examines whether the December 14 interview was custodial.

(finding an interview lasting one and one-half hours was not custodial). The record does not reflect that the officers raised their voices during the interview or threatened to arrest Defendant. Instead, during the interview, Defendant was advised that he could leave at any point and could have a lawyer present, if he so chose.

Considering the totality of the circumstances, the undersigned finds that the interview on December 14 was also not custodial because a reasonable person in the Defendant's position would have felt free to end the questioning and leave.

### 2.    Voluntariness

Defendant argues that neither his statements to TFO Mashburn on the front steps of his residence nor his statements during the interview at the DEA office the following day were voluntary [Doc. 154 pp. 9–11; Doc. 183 pp. 14–15]. Instead, he maintains that his statements were the product of coercive police conduct [Doc. 183 p. 10]. Specifically, he contends that during the search of his residence, he was under pressure because he feared arrest [Doc. 154 pp. 9–10].[4] He contends that during the interview at the DEA office, "the government compulsion was the threat of immediate arrest should he fail to appear at the meeting, or worse, fail to provide the officers with actionable intelligence" [Doc. 183 p. 15]. He asserts the officer's conduct in "holding back from arresting [him] and seiz[ing his] money to extract information and a confession" was "objectively coercive" [*Id.*]. Defendant contends that his "fear of arrest was the 'crucial motivating factor' in his decision to speak with the officers" [*Id.*].

Three factors are necessary for an involuntary statement: "'(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear [the] defendant's

---

[4]    Defendant briefly argues that his statements at the residence were involuntary, due to the pressure he experienced from his fear of arrest [Doc. 183 p. 14]. Defendant's primary focus, however, is whether his statements at the DEA office on December 14, 2021, were voluntary [*Id.* at pp. 14 – 15], which is where the undersigned will focus the analysis as well.

will; and (3) [the] defendant's will was, in fact, overborne as a result of the coercive police activity.'" *United States v. Jacobs*, 63 F.4th 1055, 1058 (6th Cir. 2023) (quoting *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *United States v. Prigmore*, 15 F.4th 768, 779 (6th Cir. 2021) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) (explaining that "some element of police coercion is always necessary" for an involuntary statement). "If the police misconduct at issue was not the 'crucial motivating factor' behind [the defendant's] decision to confess, the confession may not be suppressed." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (citations omitted).

Here, none of the three factors were present. First, Defendant fails even to allege objectively coercive conduct on the part of law enforcement. He points to their seizure of his money, which the undersigned has already found to be lawful, and their failure to arrest him. In contrast, examples of police overreach include holding gun to defendant's head, interrogating for thirty-six hours without sleep, or interrogating for several days with little food. *Connelly*, 479 U.S. at 163 n.1. The officers' behavior—speaking in normal voices, not brandishing weapons or threatening violence, offering water—was not coercive. *See Jacobs*, 63 F.4th at 1058–59 (observing that similar conduct was not coercive); *Luck*, 852 F.3d at 623 (same). The officers also advised Defendant that he could end the interview and leave at any time. Thus, police coercion, the threshold requirement for an involuntary statement, is absent.[5] *See United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021) (declining to find coercion

---

[5]     Likewise, Defendant's fear of arrest is insufficient to render his statements involuntary in the absence of coercive police conduct. *Prigmore*, 15 F.4th at 779 ("[Defendant]s 'mental condition, by itself and apart from its relation to official coercion,' cannot render his statement involuntary in the constitutional sense." (quoting *Connelly*, 479 U.S. at 164)).

when defendant failed to "identify any acts by the police that went beyond normal police-interrogation tactics").

Second, the alleged coercive conduct (failure to arrest) was not sufficient to overbear Defendant's will. Even though Defendant was not in custody, the officers generally advised him of the *Miranda* warnings. "[T]he issuance of a *Miranda* warning makes it less likely that police conduct will overbear a suspect's will." *Jacobs*, 63 F.4th at 1059. Additionally, Defendant was thirty-nine years old, had experience with the criminal-justice system, and was not under the influence of intoxicants, all facts indicating Defendant was a sophisticated participant in the interview. *Id*.

Finally, the substance of Defendant's statements at the residence and at the DEA office reveal that he presented himself for the interview to either avoid a conviction or lessen any potential sentence. Defendant's desire to "come clean" about his drug trafficking and to reveal his source of supply despite the potential danger show that the officers' conduct was not the motivation for his statements.

With none of the three factors necessary to involuntariness present, the undersigned concludes that Defendant's statements were voluntary and should not be suppressed.

## IV.     CONCLUSION

For the reasons explained, the undersigned finds that officers engaged in a consensual knock and talk at Defendant's vacation residence and conducted a protective sweep and a search of the residence pursuant to his valid consent. Although Defendant was not in custody when questioned on the front steps of his residence, he waived the *Miranda* rights and voluntarily agreed to talk with the officers. Defendant also knowingly and voluntarily made a statement on December 14, 2021, at the DEA office.

Accordingly, the undersigned respectfully **RECOMMENDS** that the District Judge deny Defendant's Motion to Suppress Evidence and Statement Obtained during the Warrantless Entry of a Residence on December 13, 2021, and to Suppress Statements to Police on December 14, 2021 [Doc. 154].[6]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).