UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    No.:   3:22-cr-78-TAV-JEM-1
    )
JASON FLENNIKEN,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation ("R&R") entered by United States Magistrate Judge Jill E. McCook on December 7, 2023 [Doc. 185]. The R&R addresses defendant's Motion to Suppress [Doc. 154]. The government responded [Doc. 166], and Judge McCook held a motion hearing on September 26, 2023 [Doc. 175]. Judge McCook then issued the R&R [Doc. 185], recommending that the Court deny the Motion to Suppress [Doc. 154].

Defendant has filed objections to the R&R [Doc. 188], the government has responded [Doc. 189], and the matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons that follow, the Court will **OVERRULE** defendant's objections [Doc. 188], **ACCEPT** and **ADOPT** the R&R [Doc. 185] in whole, and **DENY** the Motion to Suppress [Doc. 154].

## I. Background

Defendant is charged, along with 6 named codefendants, with conspiring to distribute 50 grams or more of methamphetamine from November 5, 2021, to August 8,

2022, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A) [Doc. 20, p. 1]. He is also charged with possession of a firearm in furtherance of drug trafficking on August 8, 2022, in violation of 18 U.S.C. § 924(c) [*Id.*].

The parties appeared before Judge McCook for an evidentiary hearing on September 21, 2023 [Doc. 176]. The government presented the testimony of Pigeon Forge Police Department Investigator and Task Force Officer ("TFO") Donald Mashburn, TFO Nathan Stinnett of the Oak Ridge Police Department, and Kari Sams, a Drug Enforcement Administration ("DEA") Intelligence Research Specialist [Doc. 180].

The Court presumes familiarity with the facts and procedural posture of this case. Because the parties do not object to the background and evidence basis in the R&R, the Court will adopt the following factual findings from the R&R [Doc. 185, pp. 17–20; Doc. 188, p. 2].

In late 2021, TFO Mashburn was investigating the drug trafficking activities of defendant. On November 5, 2021, a confidential source made a controlled buy of two ounces of cocaine and seven grams of methamphetamine from defendant at his home in Knoxville, Tennessee. Defendant also gave the confidential source a small amount of heroin during the transaction. On December 12, 2021, the same confidential source told TFO Mashburn that defendant was staying in a cabin in Pigeon Forge. With the aid of license plate readers, TFO Mashburn located defendant's maroon Lexus sedan parked in front of a rental home on Summit Trails Drive (the "residence").

The following day, on December 13, 2021, TFO Mashburn and other officers conducted a surveillance operation at the residence. Surveilling officers observed a white

sedan with a Kentucky temporary tag parked at the residence along with defendant's Lexus. Shortly after noon, officers covertly followed the white sedan when it left the residence. A Sevier County Sheriff's deputy stopped the white sedan for speeding in a school zone a few miles from the residence. The deputy arrested the driver, Bethel Stewart, for possession of marijuana. After being advised of the *Miranda* warnings, Stewart agreed to talk to TFO Mashburn. Stewart said he met with defendant at the residence and that he saw a large amount of methamphetamine and currency there. Methamphetamine was later seized from Stewart's person during intake at the jail.

TFO Mashburn and other officers involved in the operation returned to the residence to continue the investigation. Nine officers, all in unmarked vehicles, parked near the residence. TFOs Mashburn and Stinnett, who were clad in plain clothes with their badges visible, walked to the front door to conduct a knock-and-talk. TFO Mashburn's gun was holstered on his hip and visible. The other officers remained 25 to 30 feet away and within sight of the officers at the door.

TFO Mashburn knocked on the door, and a male occupant asked who was there. TFO Mashburn identified himself as a police officer and stated that he wanted to talk to the occupant. The man responded that he had to secure his dog. Within one minute, defendant opened the door. TFO Mashburn again identified himself and asked to talk with defendant. Defendant stepped outside onto the porch. TFO Mashburn asked if anyone was inside the residence. Defendant replied that his girlfriend and her son were inside. TFO Mashburn asked if the officers could check the residence, and defendant agreed. TFO Mashburn and a couple of officers conducted a sweep of the residence. Only defendant's

3

girlfriend Tabitha Johnson and her teenage son were present, and they were permitted to remain inside. TFO Stinnett returned to the porch, where defendant and TFO Mashburn sat on the steps, and reported on the occupants present.

Defendant told TFO Mashburn that he wanted to cooperate and speak about his involvement with drug trafficking. TFO Mashburn advised defendant of the *Miranda* rights, and defendant said he understood his rights. TFO Mashburn requested consent to search the residence, and defendant gave consent. At TFO Mashburn's request, defendant signed a rights waiver form and a consent-to-search form. TFOs Mashburn and Stinnett also signed both forms as witnesses. While still on the porch with defendant and TFO Mashburn, TFO Stinnett overheard defendant tell TFO Mashburn that he had currency in a backpack in the master bedroom of the residence. TFO Stinnett participated in the search of the residence with other officers. TFO Stinnett went to the master bedroom and located a backpack containing a large amount of currency, which was later determined to be more than $19,500.00.

While still on the porch, defendant agreed to meet with TFO Mashburn the following morning. Defendant exchanged contact information with TFO Mashburn. TFO Mashburn also exchanged contact information with defendant's girlfriend and assured her that no one would be arrested that evening.

On December 14, 2021, defendant came to the DEA office at 3:50 p.m. Defendant called TFO Mashburn when he arrived, and TFO Mashburn met him near the parking lot and walked in with him. TFO Mashburn, TFO Jerry Orr, and Analyst Kari Sams interviewed defendant. Defendant was told about his rights and that he could ask for a

4

lawyer. He was told that he could leave at any time. Defendant agreed to the interview and discussed his source of supply for methamphetamine with the officers. Defendant became emotional and wept when expressing his fear of a drug cartel and his concern for his family. Before defendant left, the officers told defendant to contact TFO Mashburn if he wanted to continue to cooperate. Defendant continued to communicate with TFO Mashburn by text message after that day.

Following the hearing, defendant submitted a post-hearing brief [Doc. 183], and the government responded [Doc. 184]. In support of his Motion to Suppress, defendant asked the Court to suppress the currency seized from the residence and his statements at the residence on December 13, 2021, and at the DEA office the following day [Doc. 154, p. 1; Doc. 183, p. 1]. He argued that the knock-and-talk, protective sweep, and warrantless search of the residence violated his rights under the Fourth Amendment [Doc. 154, pp. 4–8; Doc. 183, pp. 11–13]. He claimed the knock-and-talk was not a consensual encounter and that his consent to enter and search the residence was coerced [Doc. 154, pp. 6–8; Doc. 183 pp., 11–13]. Defendant also contended that his statements both at the residence and at the DEA office were unwarned in violation of *Miranda* and involuntary in violation of the Fifth Amendment [Doc. 154, pp. 8–11; Doc. 183, pp. 14–15].

The magistrate judge then issued the R&R [Doc. 185], recommending that the Court deny defendant's Motion to Suppress [Doc. 154]. Specifically, the magistrate judge concluded the knock-and-talk was consensual and officers conducted a sweep and a search of the residence pursuant to defendant's voluntary consent [Doc. 185, p. 20]. The magistrate judge also determined defendant was not in custody when questioned on the

5

front steps of the residence on December 13, 2021, but, nevertheless, executed a valid rights waiver and voluntarily agreed to talk with the officers. She also concluded he was not in custody when interviewed at the DEA office the next day and that he knowingly and voluntarily spoke with officers [*Id.*].

## II.     Standard of Review

The Court reviews *de novo* those portions of the R&R to which a defendant has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers the R&R, the Motion to Suppress, the parties' underlying and supporting briefs, defendant's objections, and the government's response to those objections, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review would yield a different result on that particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). A general objection, or one that merely restates arguments previously presented and addressed by the magistrate judge, does not sufficiently identify alleged errors in a report and recommendation. *See id.*

6

### III.    Analysis

Defendant raises the following objections to the R&R [Doc. 188]. He objects to the magistrate judge's conclusions regarding his Fourth Amendment claims, specifically that the knock-and-talk was consensual and that he voluntarily consented to the sweep and the subsequent search of the residence. He also objects to the R&R's determinations as to his Fifth Amendment claims, specifically that he was not in custody when questioned at the residence and at the DEA office, and that his statements to police on such occasions were voluntary and were not the product of coercive police conduct.

In response, the government urges the Court to adopt the R&R and states that defendant's objections "add nothing new" to what he previously argued in his briefing before the magistrate judge [Doc. 189]. As a result, the government relies on its prior briefing in opposition to the Motion to Suppress [*Id.*].

As explained below, where applicable, the Court finds that some of defendant's objections merely reiterate and rehash arguments that he has previously made, and which the magistrate judge has already considered. Such objections are considered general objections that do not sufficiently identify alleged errors in the R&R, and the district court need not provide *de novo* review of general objections. *See Howard*, 932 F.2d at 509; *Mira*, 806 F.2d at 637. Accordingly, those objections will be overruled.

### A.    Fourth Amendment Claims

#### i.    Knock-and-Talk

Defendant first objects to the conclusion in the R&R that his participation in the knock-and-talk was consensual and did not constitute a constructive entry [Doc. 188, p. 3].

The magistrate judge cited the appropriate legal standard, recognizing that the Sixth Circuit has found that "a police officer knocking on the front door of a home to speak with the occupant—colloquially referred to as a 'knock and talk' procedure or technique—is generally permissible, provided it is consensual" [Doc. 185, pp. 21–22 (quoting *United States v. Mills*, 372 F. Supp. 3d 517, 530 (E.D. Mich. 2019) (citation omitted))]. An otherwise consensual knock-and-talk can evolve into a "constructive entry" when police deploy "overbearing tactics," such as officers surrounding the house, drawn weapons, raised voices, spotlights focused on the residence, and demands that the occupant come out [*Id.* at 22 (citing *United States v. Thomas*, 430 F.3d 274 (6th Cir. 2005))]. Whether or not a knock-and-talk is consensual for purposes of determining if a person was seized will often depend "on the show of force exhibited by the police." *Thomas*, 430 F.3d at 277.

The magistrate judge concluded that no overbearing tactics were present in this case [*Id.*]. The R&R provides, in pertinent part:

> TFOs Mashburn and Stinnett knocked on the front door of the residence, identified themselves as law enforcement at Defendant's inquiry, and waited for him to secure his dog. Their weapons were holstered and, in the case of TFO Stinnett not visible. When Defendant opened the door, TFO Mashburn again identified himself and asked to talk to Defendant. Defendant stepped out onto the porch of his own accord. No spotlights or sirens were employed, and the lights on the officers' unmarked vehicles were not strobing. Although Defendant points out that nine officers were present, only TFO Mashburn and TFO Stinnett approached the house. The other officers remained twenty-five to thirty feet back from the door.

[*Id.* at 22–23].

Defendant specifically objects to the magistrate judge's conclusion that police did not use "overbearing tactics" in carrying out the knock-and-talk [Doc. 188, pp. 3–4 (citing

Doc. 185, p. 21)]. He analogizes this case to *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), where nine officers in several patrol cars surrounded the defendant's home at night, flooded the home with spotlights, blocked the defendant's car in the driveway so he could not leave, and summoned the defendant to exit the home with a bullhorn. *Id.* at 1161, 1164. After the defendant responded to this "show of official authority" by appearing at the front door with a pistol, he was formally arrested, handcuffed, and frisked. *Id.* According to the Sixth Circuit, a reasonable person in such circumstances would believe he was under arrest. *Id.* at 1164.

Defendant also points to *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001) [*Id.* at 5], where officers, at night with their weapons drawn, positioned themselves in front of the only exit from the defendant's home, knocked forcefully, announced themselves, ordered the defendant to come outside, and then handcuffed the defendant, who was believed to be armed. *Id.* at 806–08. The Sixth Circuit determined that a reasonable person in those circumstances would have believed he was under arrest. *Id.* at 808. In so holding, the Sixth Circuit underscored one officer's testimony that the defendant would not have been permitted to stay inside of his apartment had he not come outside in response to officers' demands. *Id.*

Here, while officers "employed a softer touch," defendant claims multiple officers were deployed outside the residence, effectively surrounding it, in "an aggressive unlawful manner" [*Id.* at 4–5]. He points to TFO Stinnett's recollection that the residence was "relatively close to the road" and "some" officers may have been visible from the front porch [*Id.* (citing Doc. 180, pp. 72, 102–03, 130–31)]. He also notes TFO Mashburn's

9

recollection that the other officers were "within visual distance" of him [*Id.* (citing Doc. 180, pp. 72, 102–03)].  Based on these facts, defendant argues that, while TFOs Mashburn and Stinnett approached the front door to confront him, the other officers "fanned out" in the front yard and driveway, in an unlawful show of force.  According to defendant, a reasonable person in his position would not have felt free to leave the porch or go back inside the home [*Id.*].

The record does not support defendant's position that the officers' conduct rose to the level of a constructive entry.  As the magistrate judge recognized, only two officers, TFOs Mashburn and Stinnett, both dressed in plain clothes, knocked on the front door of the residence and interacted with defendant in carrying out the knock-and-talk [Doc. 180, pp. 25–26, 31, 101–03].  TFO Mashburn's weapon was holstered, and TFO Stinnett's was not visible [*Id.* at 27, 78–79; 103–04].  After knocking on the door four to six times, TFO Mashburn identified himself as a police officer and waited for defendant to take the time to secure his dog [*Id.* at 28, 78, 105].

Unlike *Saari* and *Morgan*, defendant was not ordered to speak with police or compelled to open the door under a badge of authority [*Id.*].  He was never handcuffed, placed in custody, or threatened with such actions [*Id.* at 33–34, 121].  After defendant willingly opened the door, and TFO Mashburn identified himself again and asked to speak with him, defendant responded "of course" and stepped onto the front porch [*Id.* at 29–30, 79, 106–07].  Defendant never told the officers to leave or that he did not want to speak with them; instead, he appeared "relaxed" [*Id.* 29–30, 106].  TFOs Mashburn and Stinnett further testified if defendant indicated he was not comfortable speaking with them, he

10

"would have been free to go" inside and leave, and the officers would have left [*Id.* at 34, 112]. *See Saari*, 272 F.3d at 806–08 (underscoring an officer's later admission that the defendant would not have been permitted to stay inside his apartment).

Further, defendant's assertion that other officers "fanned out" in the yard and effectively surrounded the residence, much like the police in *Morgan*, is not supported by the record [Doc. 188, pp. 4–5]. The other officers remained 25 to 30 feet from the door and maintained that distance [Doc. 180, pp. 101–03, 130–31]. According to TFO Mashburn, there were eight or nine other officers and seven to nine police vehicles "within [the] vicinity" of the residence, in case TFOs Mashburn and Stinnett needed them [*Id.* at 26, 72, 74, 102]. While TFO Mashburn testified that the others were within "visual distance of seeing" him, TFO Stinnett did not recall seeing other officers in their vicinity who were close to them [*Id.* at 72, 102]. To the extent visible from the front porch, the police vehicles parked in the vicinity were unmarked, the lights were not strobing, and the sirens were not employed [*Id.* at 130–31 (TFO Stinnett recalling that, while  "[s]ome" of the other officers could have been visible from the front porch, they remained 25 to 30 feet away and maintained that distance when TFOs Mashburn and Stinnett approached the residence). Defendant also has not argued that he observed the other officers or their vehicles upon opening the door and interacting with TFOs Mashburn and Stinnett. Thus, although there were nine other officers in close proximity to support the knock-and-talk, the Court does not find that their presence under these circumstances was either "inherently coercive or unjustified" or an overbearing police tactic that transformed the encounter into a constructive entry. *See Thomas*, 430 F.3d at 280.

11

The Court also recognizes that defendant presented a similar argument before the magistrate judge in the context of the voluntariness of his consent to sweep the residence, which she considered and addressed in the R&R [Doc. 185, pp. 23–25]. He previously argued, "[e]ven a passive show of force, given the number of officers and their proximity to Defendant, can have a coercive effect" especially given what he described as a "tight perimeter" around the residence [Doc. 183, p. 13]. In rejecting this assertion, the magistrate judge relied on the testimony of TFOs Mashburn and Stinnett, as the Court has detailed above [Doc. 185, p. 25]. Defendant again objects, arguing the magistrate judge's conclusion is contrary to the proof [Doc. 188, p. 6]. To the extent his objection reiterates an argument he previously made, it is a general objection and is overruled. *See Howard*, 932 F.2d at 509; *Mira*, 806 F.2d at 637. Nevertheless, for the reasons above, and upon *de novo* review of the record, the Court finds his objection is without merit.

In sum, the hallmarks of constructive entry are not present in this case, and defendant's objections on this ground are overruled.

### ii.  Protective Sweep

Next, the magistrate judge rejected defendant's argument that he did not voluntarily consent to the officers' sweep of the residence [Doc. 185, pp. 23–25]. Defendant objects to the R&R's conclusion that, under the totality of the circumstances, he gave voluntary consent to officers to conduct the sweep, and he maintains that his consent was the product of duress or coercion [Doc. 188, p. 5]. He argues that the officers arrived unannounced in numbers and strategically caught him off guard to pressure and intimidate him into consenting to a search [*Id.* at 6]. He also objects to the magistrate judge's finding that

officers had not formed a perimeter around the porch [*Id.*], which, as explained in the prior subsection, is not supported by the record.

"Whether consent is voluntary is a question of fact determined from the totality of the circumstances." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006). The Sixth Circuit has identified several factors relevant to such determination, including "the age, intelligence, and education of the individual giving consent, whether the individual understands that he or she has a right to refuse consent, whether the individual understands his or her constitutional rights, the length and nature of any detention, and to what extent the police engaged in coercive or punishing conduct." *See United States v. Tatman*, 397 F. App'x 152, 164 (6th Cir. 2010) (citation omitted). Nonetheless, "there is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was validly and voluntarily given." *See United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999)

The R&R provided the correct legal standard for determining whether consent is voluntary [Doc. 185, pp. 23–24]. Applying that standard, the magistrate judge found the following:

> TFO Mashburn and TFO Stinnett testified that they knocked on Defendant's door and asked to talk to him. They were dressed in plain clothes and driving an unmarked vehicle. Although armed, neither officer drew his weapon, and TFO Stinnett's weapon was not visible. The officers were calm and cordial. TFO Mashburn described Defendant's demeanor as "normal" and stated he was not upset or impaired. The length of the encounter at that point was brief, with the request to "check" the house coming within a minute of Defendant stepping outside. Finally, as to his personal characteristics, Defendant avers that in December 2021, he was thirty-nine years old, literate, had several misdemeanor convictions in state court, and "cognitively he was capable of judging whether to provide consent" [Doc. 154 pp. 6–7]. These

13

circumstances all support a finding that Defendant voluntarily consented to the sweep of his residence.

[*Id.* at 24].

The Court likewise concludes that, in the totality of the circumstances, defendant voluntarily consented to a sweep of the residence. As explained *supra*, only TFOs Mashburn and Stinnett, both dressed in plain clothes with their weapons holstered at all times, knocked on defendant's door and asked to speak with him. After taking the time to settle his dog, defendant agreed to speak with them and willingly came out of the residence and onto the porch. After about one minute, TFO Mashburn asked if officers could check for others inside the residence, and defendant agreed [Doc. 180, pp. 30–32, 80–82, 107]. In so requesting, officers did not make any coercive demands, instruct defendant to come out of the residence or speak with them, or otherwise threaten him. And while other officers in unmarked vehicles were present, their presence at the scene was not *per se* coercive—as explained *supra*, they maintained a distance of approximately 25 to 30 feet.

Further, at the time, defendant appeared "normal" and "relaxed" and was not angry, intoxicated, or impaired [*Id.* at 30, 106–07]. The magistrate judge also pointed to defendant's personal characteristics at the time, which he does not dispute [Doc. 188, p. 7]: he was 39 years old, literate, had several misdemeanor convictions in state court, and "cognitively he was capable of judging whether to provide consent" [Doc. 185, p. 24 (citing Doc. 154, pp. 6–7)].

Finally, in support of his Motion to Suppress, defendant similarly argued that he was caught off guard by the officers' visit and that his resistance was futile [Doc. 183, p.

14

13]. Even if the visit came as a surprise, the above circumstances in the totality indicate it was not of such a surprise that defendant was unable to knowingly and intelligently provide voluntary consent. Accordingly, the Court concludes that defendant voluntary consented to a sweep of the residence, and his consent was not the product of duress or coercion. His objections on this ground are overruled.

### iii. Search of the Residence

Defendant next objects to the R&R's conclusion that, under the totality of the circumstances, he voluntarily consented to a more exhaustive search of the residence [Doc. 188, p. 6 (citing Doc. 185, pp. 25–26)].

The magistrate judge rejected defendant's argument that he had no choice but to agree to the search because officers already searched the residence during the sweep [Doc. 185, p. 25 (citing Doc. 183, p. 13)]. The R&R provided, in part:

> Defendant's age, education, and criminal history reveal his consent to the search of the residence was voluntary. Defendant was not agitated or impaired. Defendant signed a consent-to-search form agreeing that he had not been "threatened, nor forced in any way" and that he was "freely consent[ing] to this search" [Exh. 3B]. TFO Mashburn and TFO Stinnett signed as witnesses to Defendant's consent [*Id.*]. Moreover, Defendant gave verbal consent to search approximately five minutes after TFO Mashburn knocked on his door. He was sitting on the front porch steps with TFO Mashburn and had told Mashburn that he wanted to cooperate. TFO Stinnett had concluded the protective sweep and reported that only Defendant's girlfriend and her son were inside. [Defendant's girlfriend] and her son were permitted to remain inside.

[*Id.* at 26].

Defendant takes issue with the R&R's "failure to consider the subtleties of the officers' behavior" while they swept the home [Doc. 188, p. 7]. He maintains, "[f]rom

[his] perspective, it was hopeless to object" after officers performed the sweep because they had walked through the home, interacted with witnesses, and pinpointed the location of personal property for future use. Even though he provided verbal consent to search the residence and executed a written consent-to-search form, he argues that "the damage was done and his resistance was futile" [*Id.*].

But these are the same arguments that he raised in his suppression briefing, which the magistrate judge properly considered, addressed, and rejected in the R&R. Indeed, he previously argued that he was "caught off guard" and "resistance was futile" because officers already entered and searched the residence and looked for others and any contraband in plain view [Doc. 183, p. 13].

He also claims the record is silent as to whether he was advised that he could refuse the search, noting "knowledge of the right to refuse consent is one factor to be taken into account" in the totality of the circumstances [Doc. 188, p. 7 (internal quotation marks omitted) (citing *Worley*, 193 F.3d at 387)]. In light of the "stressful situation involving overwhelming police presence," defendant contends that the fact he executed the consent-to-search form should not carry weight [*Id.* (citing *Tatman*, 397 F. App'x at 165)].

These too are the same arguments defendant raised in his suppression briefing. Specifically, he argued that no one told him he had a choice to say no or presented him with "a document advising [him] of [his] constitutional rights or spelling out in clear terms that [he] will consent to a search of [his] residence" [Doc. 183, p. 11]. To the extent he attempts to reargue these same issues that were before the magistrate judge, his objections are overruled. *See Howard*, 932 F.2d at 509.

16

Nonetheless, upon *de novo* review, the Court finds, under the totality of the circumstances, defendant voluntarily consented to a search of the residence. He does not object to the R&R's characterization of his age, education, and criminal history, which "reveal his consent to the search of the residence was voluntary" [Doc. 185, p. 25; Doc. 188, p. 7]. As discussed *supra*, officers wore plain clothes, and their weapons were holstered. After consenting to the initial sweep, defendant's demeanor remained the same—he appeared "relaxed" and was neither nervous nor under the influence of intoxicants [Doc. 180, pp. 106–07, 111–12]. That defendant's girlfriend and son were allowed to remain inside after officers spent two to three minutes sweeping the residence (as opposed to being ordered outside onto the porch) undercuts defendant's position that the encounter was overwhelmingly stressful or inherently coercive [*Id.*; Doc. 185, p.18].

TFO Mashburn then provided defendant the *Miranda* warnings and advised him that he did not have to speak [Doc. 180, pp. 35–36; Doc. 185, p. 26]. In response, defendant told TFO Mashburn that he wished to "cooperate" and "come clean about some things" [Doc. 180, p. 36]. About five minutes after knocking, TFO Mashburn asked defendant for consent to search the residence, and defendant orally agreed [*Id.* at 37]. Defendant also executed a written *Miranda* waiver and consent-to-search form [*Id.*at 38, 113, 155]. He did not hesitate or express any doubts in signing the consent-to search form, which provided that he had not been "threatened, nor forced in any way" and that he "freely consent[ed] to this search" [*Id.* at 41; Exh. 3B]. And as discussed *supra*, officers made no demands of defendant or threatened him with arrest or other coercive conduct.

Altogether, these factors demonstrate that defendant's consent to search the residence was voluntary. *Cf. Tatman*, 397 F. App'x at 164–65 (finding the defendant's wife's consent was involuntary when it was given in the middle of the night after a domestic dispute occurred with the defendant, who was subsequently taken away in handcuffs and placed in the back of a police cruiser). The record does not demonstrate that there was an "overwhelming police presence" that amounted to a more "subtle form[ ] of coercion that [would] flaw [defendant's] judgment," thereby rendering his consent involuntary. *See id.* As a result, his objections on this ground are overruled.

### B. Fifth Amendment Claims

### i. Custodial Interrogation

Defendant next objects to the R&R's conclusion that he was not in custody when questioned by police at the residence and at the DEA office the next day [Doc. 188, p. 8 (citing Doc. 185, pp. 27–29)]. While he acknowledges that the R&R provides the correct legal standard, he takes issue with its characterization of the facts and argues that his statements were the product of a custodial interrogation [*Id.* at 8–9 (citing Doc. 185, pp. 27–29)].

At the residence on December 13, 2021, he asserts that even though guns were not drawn, officers used their numerical advantage to overwhelm and intimidate defendant [Doc. 188, p. 9]. He claims he remained separate from his girlfriend and her son, who were inside the residence, which "only served to heighten the tension" and crossed the line into custodial interrogation [*Id.* at 10].

18

The Court agrees with the magistrate judge's characterization of the facts and conclusion that, in the totality of the circumstances, the interview at the residence did not rise to the level of custodial interrogation. Questioning that occurs in a "comfortable and familiar" setting, such as one's home, "often" will not rise to a custodial encounter but may become custodial based on "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the nature of the questioning." *United States v. Panak*, 552 F.3d 462, 466–67 (6th Cir. 2009). Defendant's residence could have become police-dominated if a reasonable person would "perceive [the officers' presence and conduct] as unduly hostile, coercive and freedom-restraining." *Id.* at 466. Here, none of the hallmarks that can transform an at-home interview into a custodial interrogation are present [Doc. 185, p. 28].

*United States v. Haque*, 315 F. App'x 510 (6th Cir. 2009) is instructive in resolving this objection. In that case, approximately 12 law enforcement agents executing a search warrant entered a home wearing raid jackets with their weapons drawn. *Id.* at 519. "However, the weapons were holstered and the raid clothing was removed once the house was secured." *Id.* The officer who interviewed the suspect homeowner arrived later in plain clothes, asked if they could talk, and the suspect agreed. *Id.* "During the interview, [the suspect] was not handcuffed, his movement was not restricted, and nothing was recorded. [The suspect] was initially nervous, but later grew relaxed." *Id.* The Sixth Circuit agreed with the district court that the suspect was not in custody and that his statements should not be suppressed. *Id.*

19

Here, as described *supra*, while nine other officers were on scene, only TFOs Mashburn and Stinnett, who were in plain clothes, interacted with defendant on his porch. After TFO Mashburn identified himself and asked to speak with defendant, defendant willingly came outside onto the porch and agreed to talk after taking the time to settle his dog. Within five minutes of knocking on the door, TFO Mashburn provided defendant the *Miranda* warnings and defendant signed a rights waiver, acknowledging that he understood his rights. TFO Mashburn also advised defendant that he did not have to speak with him, but defendant, appearing normal and relaxed, stated that he wanted to cooperate and come clean. As a result, he remained outside on the front porch steps and spoke with TFO Mashburn.

Further, like *Haque*, during the interview, which lasted no more than 30 minutes, defendant was not handcuffed, his movement was not restricted, and nothing was recorded. *See id. See also Panak*, 552 F.3d at 467 (observing that an interview lasting between 45 and one hour is a "length of time that compares favorably with other encounters [the Sixth Circuit has] deemed non-custodial"). Indeed, defendant could have returned inside and joined his girlfriend and her son, who were allowed to remain in the residence after the initial sweep (as opposed to being ordered outside the home) [Doc. 180, pp. 34, 112]. Moreover, as noted *supra*, police did not draw their weapons or make any demands under a badge of authority. Nor did they demand that defendant remain separate from his girlfriend or her son. All these facts are "'consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave,' or, to be more precise in the setting of one's home, to ask the investigators to leave." *See*

20

*Panak*, 552 F.3d at 468 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 644–45(2004)). As a result, the questioning at the residence did not rise to the level of custodial interrogation.

Defendant also objects to the R&R's conclusion that he was in custody during the interview at the DEA office the next day [Doc. 188, p. 10]. He agrees that he was not handcuffed during the interview and that the officers told him he was not under arrest but maintains that no formal *Miranda* warnings were provided. He argues his "presence was secured by coercion" because of TFO Mashburn's decision not to arrest him the previous day [*Id.*]. According to defendant, a reasonable person in his position would have felt compelled to stay as long as necessary or else face arrest [*Id.* at 10–11].

Defendant previously raised similar arguments in his suppression briefing, which the magistrate judge addressed in concluding that his statements at the DEA office were voluntary [Doc. 185, pp. 30–32; Doc. 183, pp. 10, 14–15]. Specifically, he argued it is "objectively coercive to hold back from arresting someone and seize their money, to extract information and a confession" and that his "fear of arrest was the 'crucial motivating factor' in his decision to speak with the officers" [Doc. 183, p. 15]. As he attempts to reargue the same issues that were before the magistrate judge and addressed in the R&R, his objections are overruled. *See Howard*, 932 F.2d at 509.

Further, upon review of this portion of the R&R, the Court finds no error in the magistrate judge's reasoning or conclusion. The magistrate judge carefully analyzed the evidence before her and reached her conclusions in light of the applicable law. Defendant voluntarily traveled to the DEA office for the interview, and he remained unrestrained

21

throughout [Doc. 188, p. 10]. Officers did not place him under arrest or otherwise indicate that he was not free to leave. Indeed, he was affirmatively told that he was free to leave at any time. *See Biros v. Bagley*, 422 F.3d 379, 390 (6th Cir. 2005). Defendant's objections on this ground are overruled.

## ii. Voluntariness

Finally, defendant objects to the R&R's conclusion that his statements at the residence and the DEA office were voluntary [Doc. 188, p. 11].

The R&R provides the correct legal standard, as follows:

> Three factors are necessary for an involuntary statement: "'(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear [the] defendant's will; and (3) [the] defendant's will was, in fact, overborne as a result of the coercive police activity.'" *United States v. Jacobs*, 63 F.4th 1055, 1058 (6th Cir. 2023) (quoting *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *United States v. Prigmore*, 15 F.4th 768, 779 (6th Cir. 2021) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) (explaining that "some element of police coercion is always necessary" for an involuntary statement). "If the police misconduct at issue was not the 'crucial motivating factor' behind [the defendant's] decision to confess, the confession may not be suppressed." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (citations omitted).

[Doc. 185, pp. 30–31]. The magistrate judge then concluded that none of the three factors are present in this case [*Id.* at 31].

Defendant first complains that the R&R only briefly addressed his arguments about his statements at the residence [Doc. 188, p. 11]. But the magistrate judge indeed addressed the arguments before her, explaining in a footnote,

> Defendant briefly argues that his statements at the residence were involuntary, due to the pressure he experienced from his fear of arrest [Doc. 183, p. 14]. Defendant's primary focus, however, is whether his statements at the DEA office on December 14, 2021, were voluntary [*Id.* at 14–15], which is where the undersigned will focus the analysis as well.

[Doc. 185, p. 30 n. 4 (internal citations modified)].

Moreover, defendant's objection largely rehashes his version of events at the residence—i.e., that the "heavy police presence" was meant to overwhelm him, that officers "demanded" consent to sweep the residence, and that he was not arrested but that TFO Mashburn "pressed the importance of the meeting" the next day "or else" defendant would be arrested [Doc. 188, p. 11–12]. As discussed *supra*, such assertions are not supported by the record. Further, these arguments were not presented before the magistrate judge, and parties may not "raise at the district court stage new arguments or issues that were not presented" before the magistrate judge. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000).

As to his interview at the DEA office, defendant reiterates that "the fear of arrest was pervasive," which constituted objectively coercive conduct [*Id.* at 12]. He claims he had two options that day: either show up and provide "actionable information" or do not show up and face arrest [*Id.*]. But defendant again repeats the same arguments that were presented before the magistrate judge. He previously argued that he was compelled to make incriminating statements under the "threat of immediate arrest should he fail to appear at the meeting" or fail to provide "actionable intelligence; all against the background of the events of the day before" [Doc. 183, p. 15]. And while he now acknowledges that "some discussion of rights did take place (that Defendant was free to leave and permitted

23

to have counsel present)," he claims the threat of arrest was sufficient to overbear his will because he did not execute a written waiver of his rights [Doc. 188, p. 12]. Finally, he maintains he appeared at the DEA office to avoid arrest, not to "'avoid conviction or lessen any potential sentence,'" as the R&R provided [*Id.* (citing Doc. 185, p. 32)].

Nevertheless, upon *de novo* review, the Court concludes that officers did not engage in any objectively coercive conduct, either at the residence or at the DEA office. Examples of the psychological pressures that have been deemed coercive police conduct include subjecting a defendant to four hours of questioning while he is incapacitated and sedated in an intensive-care unit; interrogating a defendant, who is on medication, for over 18 hours without providing him with food or opportunity to sleep; holding a gun to a defendant's head; and questioning a defendant by alternating officers for 36 consecutive hours, without allowing him to sleep. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 n.5 (6th Cir. 1994).

No analogous coercive police conduct exists in this case. Defendant voluntarily agreed to meet with officers at the DEA office, having arranged his own transport to the interview [Doc. 180, pp. 49–50]. *See United States v. Flack*, No. 3:08-CR-108, 2009 WL 5031320, at *30 (E.D. Tenn. Dec. 11, 2009). Further, he was never handcuffed, ordered to speak with officers, or told he could not leave, either at the residence or the DEA office. Contrary to his assertion, he was not threatened with arrest or arrested on either occasion. Officers did not raise their voices or yell at him or otherwise make any demands, nor did they brandish weapons or handcuffs. The interview at the DEA office lasted approximately two hours and defendant was provided water [*Id.* at 144, 147–48]. In these circumstances, that defendant may have been fearful of arrest does not mean he acted involuntarily in

24

deciding to meet with officers. *See Flack*, 2009 WL 5031320, at *30 ("The fact that Defendant could have been arrested for failing to cooperate does not mean that he acted involuntarily in deciding to meet officers."). Thus, the "necessary predicate" for an involuntary statement—coercive police conduct—is not present in this case. *See Jacobs*, 63 F.4th at 1059.

Even if the officers' conduct was objectively coercive, it was not sufficient to overbear defendant's will. Defendant was generally advised of his rights at the residence and the DEA office, which helps "ensure that the police do not coerce or trick captive suspects into confessing." *See Jacobs*, 63 F.4th at 1059. As discussed *supra*, he was given the *Miranda* warnings, both orally and in writing, at the residence. At the DEA office, he was told about his rights and advised that he could ask for a lawyer and leave the interview at any time [Doc. 180, pp. 95, 141, 147–48, 151]. Further, defendant does not dispute that, at the time, he had previous experience with the criminal justice system, was 39 years old, and was neither intoxicated nor impaired when he met with officers, making it more "likely he is to be able to resist pressure during an interrogation" [Doc. 188, p. 7]. *See Jacobs*, 63 F.4th at 1059. Such circumstances demonstrate that defendant knowingly and intelligently understood his rights and was "able to resist pressure" that arose in the interviews. *See id.*

Finally, even if the allegedly coercive activity had been sufficient to overbear defendant's will, it was not the crucial motivating factor in his decision to offer the statements at issue. *See McCall*, 863 F.2d at 459. Based on the substance of his statements, the Court agrees with the magistrate judge that defendant's statements were motivated by a desire to avoid arrest or conviction or lessen any potential sentence, and not by any

coercive police conduct [Doc. 185, p. 32].  *See Jacobs*, 63 F.4th at 1059.  Defendant advised TFO Mashburn at the residence that he was suffering from a terminal illness, had six months to live, wanted to "do things right," "come clean," and "cooperate" [Doc. 180, pp. 36, 47].  At the DEA office, defendant told officers that he wanted to cooperate but that he was afraid of the cartel and feared for his safety [*Id.* at 146].  Following the interview at the DEA office, defendant continued to willingly communicate with TFO Mashburn via text message and telephone calls, further underscoring the voluntariness of his statements that day [*Id.* at 51].

In light of the above, defendant's objections on this ground are overruled.

## IV.    Conclusion

Accordingly, upon a careful and *de novo* review of the record and the law, the Court finds that the recommendations contained in the R&R are correct.  Defendant's objections [Doc. 188] are **OVERRULED**.  The Court **ACCEPTS in whole** the R&R [Doc. 185] and incorporates it into this Memorandum Opinion and Order.  The Court hereby **DENIES** defendant's Motion to Suppress [Doc. 154].

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE